UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

KEN AND MARY LOU ROGERS,

                    Plaintiffs,                    NO. CV-04-5028-EFS

          v.

CITY OF KENNEWICK, a municipal          **ORDER DENYING DEFENDANTS'**
corporation; BENTON COUNTY,             **MOTIONS FOR NEW TRIAL**
WASHINGTON, a political
subdivision in the State of
Washington; RICHARD AND JANE DOE
DOPKE, husband and wife,
individually and as a marital
community; RYAN AND JANE DOE
BONNALIE, husband and wife,
individually and as a marital
community; BRAD AND JANE DOE
KOHN, husband and wife,
individually and as a marital
community; JEFF AND JANE DOE
QUACKENBUSH, husband and wife,
individually and as a marital
community,

                    Defendants.

     Before the Court, without oral argument, are the Defendants' Motions for New Trial (Ct. Recs. 291 & 294), asking the Court to set aside the jury verdict and order a new trial on the grounds that the Verdict (Ct. Rec. 259) is inconsistent and contrary to the clear weight of the evidence.  Plaintiffs oppose the motion.  After reviewing the submitted materials and relevant authority, the Court is fully informed.  As is explained below, the Court **denies** Defendants' motions.

ORDER ~ 1

A.    **Background and Procedural History**

In the early morning hours of a midsummer's night, Ken Rogers, a working man innocent of any wrongdoing, was lawfully sleeping in the back yard of his stepson's home when out of the darkness and without warning, a large, vicious dog attacked him. Mr. Rogers was then beaten by unknown assailants with knees, fists, and flashlight while the dog continued to bite him. The dog was a Kennewick Police Department "bite-and-hold" K-9; the assailants were law enforcement officers of the City of Kennewick and a Benton County deputy sheriff.

This misfortune was the conclusion of a chain of events that began at about 1:00 a.m. on July 13, 2003, when Sergeant Dopke of the Kennewick Police Department activated his overhead lights and followed a man riding a miniature motor scooter without a helmet or lights for a very short distance and time to a residence where the motorist entered the garage of a home in a residential neighborhood. The garage door was shut behind him by a female resident of that home.  The residents of the home described the motorist as a person named "Troy", last name unknown, who happened to be walking by the house late that night, saw them outside, asked if he could take the scooter for a ride and was permitted to.  One of the women explained that she closed the garage door because "Troy" asked her to.  The two male residents denied being "Troy;" "Troy" was said to have run through the house and out the back door into the yard and then over the back fence.  Though Sgt. Dopke repeatedly told the residents that he was only interested in issuing the man a traffic citation and leaving, the residents persisted in this story.  He then called out a bite-and-hold K-9 that could only detect scent by air

sniffing, not sniffing an object such as the miniature motor scooter or the floor of the house or the grass of the backyard.  When the K-9 reacted to the area of the backyard adjacent to the yard where Mr. Rogers was then sleeping oblivious to these events, Officer Kohn, the K-9 officer, and two other law enforcement officers were directed by Sgt. Dopke to search for and apprehend "Troy", the traffic violator.  It was in following that order that Officer Kohn later unleashed the K-9 when reacting to scent in the driveway of the backyard of the house where Mr. Rogers was lawfully sleeping with the permission of the owner, his stepson. The above-described encounter followed.  Much later, "Troy" was determined to have been one of the male residents of that house.

As a result of this encounter, Mr. Rogers filed suit against the officers involved, the City of Kennewick, and Benton County.  Mr. Rogers asserted constitutional violations under 42 U.S.C. § 1983 and state law claims of battery, false arrest, and false imprisonment.  After hearing the evidence, the jury was read and given a set of instructions, followed by closing arguments.  The closing arguments are indicative of the way the case was tried and defended, which was that this was primarily a federal constitutional lawsuit. Mr. Rettig, co-counsel for Plaintiffs, devoted the vast majority of his one-hour closing argument to the claims of constitutional violations with less than one minute in which the three state law tort claims were mentioned in passing.  In his rebuttal, Mr. Rettig did not mention the three state law claims but rather devoted a good deal of his time to the issue of intentional conduct, an element of the constitutional claims, and to the use of excessive force as well as damages.

ORDER ~ 3

1   Mr. Moberg, counsel for all Defendants other than Sgt. Dopke, began
2   his closing argument by stating that the Defendants did not violate the
3   constitutional rights of Mr. Rogers.  In his hour-long closing argument,
4   Mr. Moberg mentioned the three state law claims only in passing, devoting
5   no more than a couple of minutes to them, with the balance of his time
6   focused on the constitutional claims and damages.    Likewise, Mr.
7   McFarland, counsel for Sgt. Dopke, addressed the jury in his closing by
8   immediately focusing on the devastating effect that the allegation that
9   he violated the constitutional rights of Mr. Rogers had on Sgt. Dopke.
10  Mr. McFarland then spent the vast majority of his fifty-two minute
11  closing arguing that Plaintiffs failed to prove constitutional
12  violations.

13     After deliberating for approximately eleven hours, the jury returned
14  a verdict in favor of Plaintiffs against Defendants on the 42 U.S.C. §
15  1983 cause of action claiming unreasonable seizure. (Ct. Rec. 259.)  In
16  all other respects, the verdict was for Defendants, *i.e.* the jury found
17  in favor of Defendants on the 42 U.S.C. § 1983 unlawful search and
18  deprivation of medical treatment causes of action and state law causes
19  of action for battery, false imprisonment, and false arrest. *Id.*  The
20  jury awarded economic and non-economic damages in Plaintiffs' favor, as
21  well as awarded punitive damages against Defendants Dopke and Kohn. *Id.*

**B.   Whether Defendants Waived Ability to Challenge Defects in Verdict**

23     Plaintiffs contend the Defendants waived any objections as to
24  defects in the verdict form that were not raised before the jury retired
25  for deliberations.  The Court concludes the Defendants did not waive
26  their current objections that were not previously raised, as such

ORDER ~ 4

objections of Defendants pertain to the substance of the jury's answers in the Verdict, rather than to the form of the Verdict form itself.  *See Los Angeles Nut House v. Holiday Hardware Corp.*, 825 F.2d 1351, 1354-56 (9th Cir. 1987).

**C.    Whether the Verdict is Inconsistent or the Result of Passion or Prejudice**

Defendants contend the jury's finding that the officers unreasonably seized Mr. Rogers in violation of the Fourth Amendment cannot be reconciled with the findings that the officers did not falsely arrest Mr. Rogers and/or did not commit battery.  Defendants also maintain the award of punitive damages is inconsistent with the defense verdict on the state law clams.  Defendants argue these inconsistencies are the result of the jurors' passion and prejudice against police canines and that Defendants were not able to fully support their motions for new trial because the Court denied their requests to interview the jurors.

Federal Rule of Civil Procedure 59(a) provides:

> A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; . . . .

*See also* FED. R. CIV. P. 60(b).  A new civil trial is required if a verdict is inconsistent, the result of passion or prejudice, or contrary to the clear weight of the evidence.  *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 677 (7th Cir. 1985). "When faced with a claim that verdicts are inconsistent, the court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and must exhaust this effort before it is free to disregard the jury's verdict and remand the

case for a new trial." *Toner v. Lederle Labs, a Div. of Am. Cyanamid Co.*, 828 F.2d 510, 512 (9th Cir. 1987); *Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1058 (9th Cir. 2003); *Tanno v. S.S. President Madison Ves.*, 830 F.2d 991, 992 (9th Cir. 1987); *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 199 (1963)*; Stephenson v. Doe*, 332 F.3d 68, 79 (2d Cir. 2003). "The consistency of the jury verdicts must be considered in light of the judge's instructions to the jury." *Toner*, 828 F.2d at 512.

First, the Court abides by its decision to deny Defendants' motion to interview the jurors and finds this denial did not prejudice Defendants' ability to support their well-reasoned motions for new trial. *See Domeracki v. Humble Oil & Refining Co.*, 443 F.2d 1245, 1247-48 (3rd Cir. 1971); *Smith v. Cupp*, 457 F.2d 1098, 1100 (9th Cir. 1972). Second, notwithstanding any issue as to the consistency of the verdict, the Court concludes the jury was not acting out of passion or prejudice. The questioning during voir dire did not evince any prejudicial thoughts or emotions regarding the use of police canines; further, sheer speculation that a juror may have subjective thoughts and emotions that influenced the juror's deliberations is not a basis to set aside the verdict. *See Morgan v. Woessner*, 997 F.2d 1244, 1261-62 (9th Cir. 1993).

Moreover, the answers to the special interrogatories in the jury verdict demonstrate the absence of passion or prejudice. The jury found for Defendants on six of the seven claims, distinguished one constitutional claim from the others as well as from the state tort claims, awarded the modest amount of $25,000 to Mrs. Rogers for her consortium claim, awarded punitive damages against Sgt. Dopke in an amount four times greater than the award against K-9 Officer Kohn and

1  none against the other two law enforcement Defendants, and segregated the

2  compensatory damage awards with $500,000.00 of the $600,000.00 non-

3  economic damage award and $100,000 of the $150,000 future economic damage

4  award to injuries inflicted by the K-9. *See United States v. Aramony*,

5  88 F.3d 1369, 1378-79 (4th Cir. 1996)  In addition, the award for past

6  economic damages was less than requested by Plaintiffs, and the entire

7  verdict was approximately 25 percent of the amount requested by

8  Plaintiffs in closing arguments.  In fact, counsel for the Defendants

9  told the jury to award damages against the City of Kennewick on the

10  directed liability claim, with one counsel saying during closing argument

11  that the jury should award every penny Mr. Rogers had coming to him for

12  that liability.

13      When analyzed as a whole, this jury verdict is an internally

14  consistent and logical result, just the opposite of a verdict produced

15  by passion, prejudice, or extra-judicial factors.  It is consistent with

16  the way that all counsel emphasized the constitutional claims in closing

17  argument, an understandable approach because both punitive damages and

18  attorney fees could be awarded for a constitutional violation but not for

19  the state tort claims. In short, a verdict for Plaintiffs on one or more

20  of the constitutional claims had greater economic risk for Defendants and

21  greater recovery for Plaintiffs. Furthermore, the jurors read the

22  instructions so closely that they asked the Court a question regarding

23  the Instruction No. 33, the false imprisonment instruction, (Ct. Rec.

24  255), generating substitution instructions (Ct. Rec. 257).

25  ///

26  ///

ORDER ~ 7

1    With this backdrop, the Court turns to the specific wording of the

2   jury instructions and verdict form to determine whether the jury's

3   decisions were consistent.  Instruction No. 24, which defined the Fourth

4   Amendment constitutional violation of unreasonable seizure, permitted the

5   jury to find the seizure was unreasonable if the Plaintiffs proved by a

6   preponderance of the evidence either that the seizure was without

7   probable cause or that excessive force was used whether or not there was

8   probable cause.  Special Verdict Question No. 2 did not ask the jury to

9   specify whether the seizure was unreasonable because (1) the officers

10  lacked probable cause or (2) because excessive force was used in

11  effectuating the seizure.  Presumably the jury determined the officers

12  used excessive force.  As noted above, the "trial court has a duty to

13  attempt to harmonize seemingly inconsistent answers to special verdict

14  interrogatories, 'if it is possible under a fair reading of them.'" *Duk*,

15  320 F.3d at 1058 (quoting *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S.

16  108, 199 (1963)).  Under this standard, the Court finds the verdict

17  consistent.

18    In connection with the false arrest claim, even if the jury

19  determined the officers lacked probable cause to believe that Mr. Rogers

20  committed a crime, the jury could have found that "Mr. Rogers' injury,

21  damage, loss, or harm was [not] caused by the *arrest*." (Ct. Rec. 257:

22  Substituted Jury Instr. No. 33 Elem. No. 4) (emphasis added).  Rather,

23  the jury reasonably could have determined Mr. Rogers' injury, damage,

24  loss, or harm was caused by the seizure.  This would harmonize the §

25  1983 unreasonable seizure and false arrest verdicts, which Defendants

26  criticize as inconsistent.

The Court also finds an excessive force finding, presumably the basis of the jury's 42 U.S.C. § 1983 unreasonable seizure verdict, can be reconciled with the jury's state battery verdict in favor of Defendants.  Instruction 25 defined excessive force by including seven items for the jury to consider: (1) the severity of the crime or other circumstances to which the officer were responding; (2) whether Mr. Rogers posed an immediate threat to the safety of the officers or to others; (3) whether Mr. Rogers was actively resisting arrest or attempting to evade arrest by flight; (4) the amount of time and any changing circumstances during which the officer had to determine the type and amount of force that appeared to be necessary; (5) the type and amount of force used; (6) the availability of alternative methods to subdue Mr. Rogers and to take him into custody, and (7) the Kennewick Police Department's guidelines and policies.  It is highly likely in the opinion of this Court that the jury found the conduct attributed to "Troy" was a traffic violation, or at worst, a non-violent misdemeanor; that Mr. Rogers (or "Troy") posed no threat to anyone; that at the time he was attacked by the K-9, Mr. Rogers was not attempting to evade arrest by flight or resisting arrest; that all of the Defendant law enforcement officers had more than adequate time to determine if it was necessary to use a bite-and-hold K-9 in the totality of these circumstances; that the type of force used by reference to the KPD guidelines was Impact Weapon, and that there were obvious and far less harmful methods to arrest Mr. Rogers than using a bite-and-hold K-9 to seize him.  They likely concluded that Officer Kohn should have issued a loud verbal warning before unleashing the K-9 obviously strongly reacting to a scent in the

driveway immediately outside the backyard fence and that he was required to do so by the KPD regulations; and had that been done, it was unlikely that the K-9 would have been released or that it would have been necessary for them to break down the fence and pummel Mr. Rogers with knees, fists, and flashlight while continuing to permit the K-9 to bite him.  And there was evidence that Officer Kohn intentionally released the dog, saw him go though a hole and did not recall the K-9 or issue a loud verbal warning before doing so.  This evidence supports an excessive force finding.

Instruction No. 25 had what Instruction No. 30, battery, lacked: seven factors for use by the jury to determine if the force used was excessive. Defendants did not object to the absence of those factors in Instruction No. 30.   In fact, neither the Defendants' proposed instruction nor the joint proposed instruction for battery contained any suggested factors for the jury to consider in determining the force used was reasonable.  While both use the term "objectively reasonable" with regard to force, Instruction No. 25 gave the jury criteria which Instruction No. 30 did not.

In addition to the objectively reasonable determination, the excessive force claim required the jury to find "in seizing Mr. Rogers' person, that Defendant law enforcement officer acted intentionally." *Id.* at No. 23 Elem. 2.   Instruction No. 23 defined "seizes" as when a defendant willfully "restrains the person's liberty by physical force or a show of authority." The instruction also stated "[a] person acts 'intentionally' when the person acts with a conscious objective to engage in particular conduct."  These requirements are different from what the

ORDER ~ 10

jury was asked to find under battery.  Instruction No. 30 required the jury to find "intent by that Defendant law enforcement officer to bring about the unpermitted harmful or offensive contact."  Thus, even though both the causes of action have an "intent" factor, the intent factors relate to different "intents."  For instance, the jury sensibly could have determined the officers did not *intend* to "harm" or "offend" Mr. Rogers with the physical force that they intentionally utilized to seize him, *i.e.* the officers intended to use the force applied but did not intend the attendant harm.

Further, Instruction No. 30 stated that a law enforcement officer could be liable by using an instrumentality to *indirectly* cause harmful or offensive contact with Mr. Rogers.  No one objected to the use of that adverb and it may have been that "directly" was the correct term, the absence of which permitted the jury to give Defendants a verdict on the battery claim because the instrumentality, the K-9, *directly* caused harm. In addition, Instruction No. 30 on battery focused on "an act" while Instructions Nos. 23, 24, and especially 25 included standards which enabled the jury to do a comprehensive analysis on whether the seizure was unreasonable because excessive force was used and therefore a violation of Mr. Rogers' constitutional rights.  A comparison of these instructions on the two claims demonstrates sufficient differences to allow a conclusion that the verdicts are consistent.

Accordingly, the Court finds, after an examination of the instructions and evidence on the claim of unconstitutional seizure, the jury's verdict is supported and is not inconsistent with the verdict on battery.  The Court finds the jury instructions appropriately set forth

the legal standards for both the 42 U.S.C. § 1983 seizure and state battery causes of action.[1]  It was the jury's role to determine whether facts were presented to support the legal standards.  As outlined before, all counsel dwelled on the constitutional claims in closing argument, barely mentioning the state tort law claims which were practically treated throughout as tagalongs to the constitutional claims with their higher risk and reward.

The jury's unconstitutional seizure decision can also be reconciled with the jury's constitutional search decision.  The constitutional search claim required that Plaintiffs prove by a preponderance of evidence that the law enforcement Defendants intended to search this residence, and Instruction No. 19 so provided.  A finding in favor of Defendants on this claim does not lead to the single conclusion that the

_____

[1]  Defendants may even be the beneficiaries of some language inconsistencies that resulted in a favorable verdict on the constitutional search claim.  While Instruction No. 19 told the jury that Mr. Rogers was undisputedly a lawful guest at his stepson's residence, thereby possessing a right to be free from an unreasonable search at that residence, the special interrogatory on that claim asked for a determination of whether the Defendants had violated "Mr. Rogers' Fourth Amendment right to be free from an unreasonable search of *his* residence?" (Ct. Rec. 359) (emphasis added).  Perhaps, a more accurate statement - of the residence where he was lawfully sleeping - would have resulted in a verdict in his favor on that claim; this was not *his* residence but that of his stepson.

ORDER ~ 12

police acted reasonably in conducting a search of this residence.  It was only after the K-9 attacked Mr. Rogers in the backyard that the officers broke down the fence and went into the backyard.  Until that point, there was no evidence that they were searching anything but the property outside the curtilege; hence, the jury could have believed that they were not acting unreasonably at that point and that their intrusion into the backyard was not a "search" as much as a reaction to the noisy attack of the K-9 on an unsuspecting innocent victim.  The search verdict is therefore consistent with the verdict on the seizure claim.

The Court also finds a jury decision that the individual Defendants acted with reckless disregard to Mr. Rogers' constitutional right to be free from unreasonable seizure consistent with the other verdict findings.  The jury's award of a specific amount of punitive damages against Sgt. Dopke and Officer Kohn and not Mr. Bonnalie and Deputy Quackenbush is also not inconsistent, nor reflective of a passion or prejudice against police canines.  While Officer Kohn argued that he was not required to announce release of the K-9 in these circumstances, the jury was entitled to disbelieve his story that the K-9 became entangled and release was a necessary response or that, even if release was necessary, the K-9 should have been ordered to stay at that spot - which Officer Kohn failed to do.  As to Sgt. Dopke, the jury held him responsible as a supervisor who set in motion a series of acts by others that he knew or reasonably should have known would cause a deprivation of Mr. Rogers' constitutional right to be free from unreasonable seizure.  Sgt. Dopke made the decision in these circumstances to direct the officers to use a bite-and-hold K-9 to search for and apprehend the

ORDER ~ 13

suspect in a residential neighborhood.  The jury held him accountable for the unconstitutional seizure of Mr. Rogers and damages caused.  The jury was free to assess credibility and the different roles and responsibilities that each of these individuals had in the events.  The Court finds the juror's punitive damages findings are supported by the record.

**D.    Whether the Verdict was Contrary to the Law**

      1.    <u>Instruction No. 18</u>

Kennewick Defendants argue Instruction No. 18, specifying, "Deke is an instrumentality used by law enforcement," was clearly erroneous, prejudicing Defendants and confusing the jury.  An erroneous jury instruction is a basis for a new trial. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990).  Kennewick Defendants rely upon *Andrade v. City of Burlingame*, 847 F. Supp. 760, 764 (N.D. Cal. 1994), to support their position.

The Court finds *Andrade* actually supports the giving of Instruction No. 18 in this case.  In *Andrade*, the police officer never gave the canine an order to search, track, or apprehend.  In fact, the police officer did not get the canine out of the vehicle; rather the officer had simply partially opened the car window to give the canine fresh air.  Apparently, the canine was able to "sneak" out of the vehicle and then bit the victim before the officer became aware of the canine's actions.  Once the officer became aware of the canine's actions, the officer called the canine off.  It was undisputed that the officer "did not intend to use his police dog to subdue the plaintiffs." *Id.*  It was under this factual context, the Ninth Circuit stated:

ORDER ~ 14

> [t]he dog is not a defendant in this suit nor could it be.
> Nor is the dog a government actor.  At other times in their
> papers, plaintiffs make a more appropriate analogy: that the
> dog was essentially one "weapon" in Officer Harman's arsenal.
> Because Officer Harman did not intend to seize plaintiffs by
> this means, however, there can be no fourth amendment
> violation.    The key question is whether *Officer Harman*
> intended to seize plaintiffs by means of the dog and the
> answer is indisputably "no."

*Id.* at 764 (emphasis in original).  Following this discussion, the Ninth

Circuit used the particular term "instrumentality," stating, "Officer

Harman never meant to use this particular 'instrumentality' in any way

to effect the seizure.  The dog simply escaped from the patrol car after

Officer Harman had already seized the plaintiffs."  *Id.* at 765.

The Court finds under the facts presented to the jury in this case

that it was necessary to give Instruction No. 18.  There was testimony

that, at the time the K-9 bit Mr. Rogers, he was under a command by

Officer Kohn to track and apprehend the "scented" suspect.  The K-9 was

not a defendant and could not be.  Accordingly, the jury needed to be

instructed as to which Defendant the K-9's conduct was to be attributed

given that the K-9 had been "scented" and was under a command to track

and apprehend.   The Court finds Instruction No. 18 does such without

prejudicing Defendant Kohn or the other Defendants.

2.   Strict Liability under RCW 16.08.040

Kennewick Defendants also argue the Court erroneously directed a

verdict of strict liability under the Washington dog bite statute, RCW

16.08.040, and that this ruling prejudiced Defendants as is evidenced by

the excessiveness of the jury's verdict.   The Court stands by its

previous decision to apply RCW 16.08.040 to a police canine which bit an

innocent person who was lawfully on private property.  Instruction No.

ORDER ~ 15

35 and the form of the verdict were appropriate under these circumstances.  In addition, given the evidence before the jury, the verdict was not excessive.  Moreover, both Mr. Moberg and Mr. McFarland urged the jury to award the Rogers' damages for the injuries caused by the K-9 against the City whose liability the Court had directed, essentially saying to give Mr. Rogers every penny that he was entitled to.

**E.    Whether Plaintiffs' counsel's actions require a new trial**

Kennewick Defendants maintain a new trial is necessary because Plaintiffs intentionally introduced evidence that Ken Rogers turned down two promotions because of his injuries; evidence which was not previously disclosed, violating the Court's pretrial ruling excluding at trial the admission of any previously undisclosed evidence.  Kennewick Defendants contend without this evidence the jury would not have awarded $100,000 more in future economic damages than Plaintiff requested.

Kennewick Defendants did not identify for the Court the portions of the transcript at which the lost promotion evidence was introduced, and also conceded that the Court gave a curative instruction.  Given the record, the Court does not find the misconduct "'sufficiently permeate[d] [the] entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1270-71 (9th Cir. 2000) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1117 (9th Cir. 1983) (in turn quoting *Standard Oil Co. v. Perkins*, 347 F.2d 379, 388 (9th Cir. 1965) (internal quotation marks omitted)).

1       Defendants argue that Plaintiffs only asked for $41,400 in future

2   economic damage. However, Plaintiffs' counsel simply offered an approach

3   to quantifying future economic damage by pointing out that if Mr. Rogers

4   had only a single monthly trip to the chiropractor during his life

5   expectancy, it would total $41,400. That was not a demand for a specific

6   amount but rather a way of quantifying future economic damage based on

7   the testimony about that issue by various witnesses during trial.

8       Accordingly, the economic damages award will not be modified due to

9   Plaintiffs' counsel's violation of the Court's pretrial order. However,

10  the damages award must still be supported by the evidence. *See*

11  *Glovatorium, Inc. v. NCR Corp.*, 684 F.2d 658, 664 (9th Cir. 1982); *Maheu*

12  *v. Hughes Tool Co.*, 569 F.2d 459, 476-77 (1977). The Court addresses this

13  issue next.

14  **F.    Whether the Verdict is Against the Clear Weight of the Evidence**

15      1.   <u>Future Economic Damages</u>

16      Defendants argue the jury's future economic damage award of $150,000

17  is contrary to the evidence and evidences the jury's prejudice against

18  Defendants given that Plaintiffs only "requested" $41,400 in closing

19  argument. Jury Instruction No. 41 specified that the following should

20  be considered when determining future economic damages: "[t]he reasonable

21  value of necessary expenses and services, including chiropractic and

22  related expenses, with reasonable probability to be required in the

23  future." The Court finds there was such evidence before the jury on

24  which it could have based its damages finding, without considering the

25  lost promotions. For instance, Dr. Hamilton opined that Mr. Rogers "will

26  continue to suffer from this condition and therefore will need to be

ORDER ~ 17

under some level of care into the indefinite future.  Mr. Rogers will also see a long term increased rate of degenerative changes within his spinal and appendicular areas." (Trial Ex. 43: Letter dated Nov. 14, 2006.)  Although the Updated Special Damages illustrative chart (Trial Ex. 49) only figures a single chiropractic treatment per month at $200 each session, the jury could have determined, based on Mr. and Mrs. Rogers' testimony, that additional treatments may be necessary given Mr. Rogers' life style as he ages.  Accordingly, there is not clear evidence that the damage award is not supported by the evidence; therefore, it will not be disturbed.  *See Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1060 (9th Cir. 2003); *Boehm v. Ame. Broad. Co., Inc.*, 929 F.2d 482, 488 (9th Cir. 1991).

     2.   <u>Damages caused by the Police Canine</u>

It was the jury's role to assess credibility and to weigh the evidence.  The Court finds the damages award and apportionment of damages caused by the police canine are not against the clear weight of the evidence; plus, as noted above, counsel for Defendants told the jury to award damages against the City of Kennewick on the directed liability claim.

**G.    Conclusion**

Accordingly, the Court concludes the verdict is not inconsistent, it is based upon evidence presented at trial, it is legally sound, and it is not the result of passion or prejudice.  Furthermore, Plaintiffs' counsel's conduct does not require a new trial.  For the above reasons,

///

///

ORDER ~ 18

1  **IT IS HEREBY ORDERED:**

2      1.  Defendant Dopke's Motion for New Trial **(Ct. Recs. 291)** is

3  **DENIED.**

4      2.  Kennewick Defendants' Motion for New Trial **(Ct. Rec. 294)** is

5  **DENIED.**

6      **IT IS SO ORDERED.**  The District Court Executive is directed to enter

7  this Order and provide copies to counsel.

8      **DATED** this _____13^th_____ day of July 2007.

9

10                          _____S/ Edward F. Shea_____
                                 EDWARD F. SHEA
11                          United States District Judge

12

13  Q:\Civil\2004\5028.newtrial.pm.wpd

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER ~ 19